IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Equal Employment Opportunity | ) | |
| Commission, | ) | |
| | ) | C.A. No.  6:22-1960-HMH-KFM |
| Plaintiff, | ) | |
| | ) | |
| Dave Hall, | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| vs. | ) | **OPINION & ORDER** |
| | ) | |
| Fluor Federal Global Projects, Inc., | ) | |
| Fluor Corporation, and | ) | |
| Fluor Enterprises, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the Report and Recommendation ("R&R") of United

States Magistrate Judge Kevin F. McDonald, made in accordance with 28 U.S.C. § 636(b) and

Local Civil Rule 73.02 of the District of South Carolina.[1]  Plaintiff Equal Employment

Opportunity Commission ("the EEOC") originally filed suit against Defendants Fluor Federal

Global Projects, Inc., Fluor Corporation, and Fluor Enterprises, Inc. (collectively "Fluor") in the

Northern District of Georgia.  The EEOC alleges that Fluor discriminated against Plaintiff-

Intervenor Dave Hall ("Hall"), a civilian contractor, based on disability in violation of the

---

[1] The magistrate judge makes only a recommendation to this court.  The recommendation
has no presumptive weight, and the responsibility to make a final determination remains with
this court.  See Mathews v. Weber, 423 U.S. 261, 270-71 (1976).  The court is charged with
making a de novo determination of those portions of the R&R to which specific objection is
made, and the court may accept, reject, or modify, in whole or in part, the recommendation of
the magistrate judge or recommit the matter with instructions.  See 28 U.S.C. § 636(b)(1).

Americans with Disabilities Act, 42 U.S.C. § 12112(a), and (b), by failing to seek a medical waiver authorizing his redeployment and subsequently firing him.  Hall later filed an intervenor complaint raising the same claims as the EEOC.  After the case was transferred to this court, Fluor moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction.  Fluor argued, first, that it is immune from suit under the doctrine established in <u>Yearsley v. W.A. Ross Construction Co.</u>, 309 U.S. 18 (1940), and second, that the case presents a nonjusticiable political question.  In his R&R dated October 31, 2022, the magistrate judge recommended that the court deny Fluor's motion to dismiss.  Fluor filed timely objections to the R&R, to which Plaintiffs replied.  For the reasons below, the court adopts the magistrate judge's R&R and denies Fluor's motion to dismiss.

## I. FACTUAL AND PROCEDURAL HISTORY

### A.  Fluor's Contract and the Relevant Military Instructions

The United States Army utilizes civilian contractors like Fluor to provide "mission critical support services" – thereby freeing up military units to conduct other missions – as part of the Army Logistics Civil Augmentation Program ("LOGCAP").  (Defs.' Mot. Dismiss Ex. 2 (Schnorrenberg Decl. ¶ 4), ECF No. 42-3.)  During the relevant time period, Fluor performed support services for the Army in Afghanistan under the terms of the LOGCAP IV Contract. (<u>Id.</u> Ex. 2 (Schnorrenberg Decl. ¶ 2, 4), ECF No. 42-3.)  The LOGCAP IV Contract required Fluor to ensure that all personnel it deployed to Afghanistan or any other country within United States Central Command's ("CENTCOM") area of responsibility satisfied CENTCOM's fitness-for-duty standards.  (<u>Id.</u> Ex. 3 (Ex. C, at 52), ECF No. 42-4.)  As of August 2019, the operable CENTCOM standards were outlined in Modification Thirteen to CENTCOM's Individual

Protection and Individual/Unit Deployment Policy ("Modification 13") and the accompanying

PPG-TAB A: Amplification of the Minimal Standards of Fitness for Deployment to the

CENTCOM AOR ("the Amplification").  (Id. Ex. 1 (Raney Decl. ¶¶ 3, 10), ECF No. 42-2).

Modification 13 states that "[a]ll personnel . . . traveling to the CENTCOM [area of

responsibility]" – including Department of Defense ("DoD") contractor personnel – "must be

medically, dentally, and psychologically fit."  (Defs.' Mot. Dismiss Ex. 3 (Ex. B, at 14), ECF

No. 42-4.)  It provides that "[p]ersonnel found to be medically non-deployable while outside of

the CENTCOM [area of responsibility] for any length of time will not enter or re-enter the

theater until the non-deployable condition is completely resolved or an approved waiver from a

CENTCOM waiver authority is obtained."  (Id. Ex. 3 (Ex. B, at 14), ECF No. 42-4.)

Modification 13 further instructs that, because "DoD civilian employees are covered by the

Rehabilitation Act of 1973," "[a]n apparently disqualifying medical condition nevertheless

requires that an individualized assessment be made to determine whether the employee can

perform the essential functions of [his or her] position in the deployed environment, with or

without reasonable accommodation, without causing undue hardship."  (Id. Ex. 3 (Ex. B, at 14),

ECF No. 42-4.)  Modification 13 also specifies that "the CENTCOM Surgeon and/or the Service

Component Surgeon's waiver authority" – and "not the individual's medical evaluating entity or

deploying platform" – retains "[t]he final authority of who may deploy to the CENTCOM [area

of responsibility]."  (Id. Ex. 3 (Ex. B, at 14-15), ECF No. 42-4.)  Finally, Modification 13 directs

that "[c]ontractors must comply with [DoDI 3020.41] and specifically Enclosure 3 for medical

requirements."  (Id. Ex. 3 (Ex. B, at 15), ECF No. 42-4.)

The Amplification provides additional guidance on "the minimal standards of fitness for deployment to the CENTCOM [area of responsibility]." (Defs.' Mot. Dismiss Ex. 3 (Ex. B, at 33), ECF No. 42-4.) According to Col. Lance C. Raney, M.D. ("Col. Raney"), who served as Command Surgeon for CENTCOM's Army component, the Amplification was intended to clarify which conditions were medically disqualifying as "present[ing] unacceptable risks for purposes of deployment into theater." (Id. Ex. 1 (Raney Decl. ¶ 12), ECF No. 42-2). In its nonexhaustive list of "medical conditions precluding medical clearance," the Amplification includes:

**E. Cancer:**

> **1.** Cancer for which the individual is receiving continuing treatment or which requires frequent subspecialist examination and/or laboratory testing during the anticipated duration of the deployment.

> **2.** Precancerous lesions that have not been treated and/or evaluated and that require treatment/evaluation during the anticipated duration of the deployment.

> **3.** All cancers should be in complete remission for at least a year before a waiver is submitted.

(Id. Ex. 3 (Ex. B, at 39), ECF No. 42-4.) Like Modification 13, the Amplification specifies that "DoD Contract personnel will be evaluated for fitness according to DoDI 3020.41." (Id. Ex. 3 (Ex. B, at 33), ECF No. 42-4.)

DoDI 3020.41 "[e]stablishes policy, assigns responsibilities, and provides procedures" for DoD contractors. (Hall Resp. Opp'n Ex. E (DoDI 3020.41, at 2), ECF No. 53-5.) Relevant here, it requires that contract personnel be "medically, dentally, and psychologically fit" and refers to Enclosure 3 for specific "guidance on contractor medical, psychological, and dental

4

fitness." (Id. Ex. E (DoDI 3020.41, at 3), ECF No. 53-5.)  Enclosure 3 states that its

requirements apply to DoD contracts that deploy "contractors authorized to accompany the

force" – or "CAAF" – while specifying that "[t]he geographic [Combat Commander] will

establish theater-specific medical qualifications."  (Id. Ex. E (DoDI 3020.41, at 29), ECF No.

53-5.)  Enclosure 3 provides a list of "conditions usually precluding medical clearance."

(Id. Ex. E (DoDI 3020.41, at 33), ECF No. 53-5) (cleaned up).  Included in the list is "[c]ancer

for which the individual is receiving continuing treatment or that requires periodic specialty

medical evaluations during the anticipated duration of the deployment."  (Id. Ex. E (DoDI

3020.41, at 34), ECF No. 53-5.)

> Enclosure 3 clarifies that:
>
> [i]n general, individuals with [a listed condition], based on an individual assessment
> pursuant to [DoDI 6490.03], will not normally be approved for deployment.  The
> medical evaluator must carefully consider whether climate; altitude; nature of
> available food and housing; availability of medical, behavioral health, and dental
> services; or other environmental and operational factors may be hazardous to the
> deploying person's health because of a known physical or mental condition.

(Hall Resp. Opp'n Ex. E (DoDI 3020.41, at 33), ECF No. 53-5.)  Enclosure 3 also provides

that "[i]f a contractor believes an individual CAAF employee with one of the conditions listed

 . . . can accomplish his or her tasks and duties and tolerate the environmental and operational

conditions of the deployed location, the contractor may request a waiver for that individual

through the contracting officer or designee."  (Id. Ex. E (DoDI 3020.41, at 36), ECF No. 53-5.)

**B. Hall's Cancer Diagnosis and Termination**

Hall worked for Fluor as a civilian contractor from 2010 to 2019 and was regularly

deployed to Afghanistan during this time.  (Hall Compl. ¶¶ 19, 20, 29, ECF No. 17.)  In July

2019, Hall was diagnosed with prostate cancer while on leave in the United States.  (Id. ¶ 23, ECF No. 17.)  He underwent surgery to remove his prostate on August 12, 2019.  (Id. ¶ 24, ECF No. 17.)  After the surgery, Hall claims that he was told that "no further treatment was necessary" since "there was no evidence of disease outside of his prostate."  (Id. ¶¶ 23-25, ECF No. 17.)  As a result, Hall submitted documentation to Fluor on August 27, 2019, "clearing him to work with no restrictions."  (Id. ¶ 26, ECF No. 17.)  Fluor responded a day later, informing Hall that he was medically disqualified because his cancer had not been in complete remission for twelve months.  (Hall Resp. Opp'n Ex. B (8/28/19 Email 2), ECF No. 53-2.) Fluor then fired Hall on August 29, 2019.  (Hall Compl. ¶ 29, ECF No. 17.)  Hall followed up with Fluor the same day.  He explained that "there are no more cancer cells" because his prostate had been removed and requested "further inquiry" into his termination.  (Hall Resp. Opp'n Ex. D (8/29/19 Email 3), ECF No. 53-4.)  Fluor responded: "Mod 13 is exceptionally clear: all cancers must be in complete remission for 12 months before a waiver will be considered.  This is a CENTCOM issue, not ours."  (Hall Resp. Opp'n Ex. D (8/29/19 Email 2), ECF No. 53-4.)

The EEOC filed the instant case against Fluor in the Northern District of Georgia on September 30, 2021.  (EEOC Compl., ECF No. 1.)  Hall filed an intervenor complaint on April 8, 2022.  (Hall Compl., ECF No. 17.)  On June 21, 2022, the district court granted Fluor's motion to transfer the case to this district.  (Order, ECF No. 21.)  Fluor then moved to dismiss for lack of subject-matter jurisdiction on July 25, 2022.  (Defs.' Mot. Dismiss, ECF No. 42.) Both the EEOC and Hall filed responses in opposition on August 22, 2022.  (EEOC Resp. Opp'n, ECF No. 52.); (Hall Resp. Opp'n, ECF No. 53.)  Fluor replied on September 12, 2022. (Defs.' Reply, ECF No. 56.)  On October 31, 2022, the magistrate judge issued the R&R

recommending that the court deny Fluor's motion to dismiss.  (R&R, ECF No. 58.)  Fluor timely

filed objections to the R&R on November 14, 2022.  (Defs.' Objs., ECF No. 61.)  Hall replied to

Fluor's objections on November 28, 2022.  (Reply Defs.' Objs., ECF No. 63.)  This matter is

now ripe for review.

## II. LEGAL STANDARDS

### A. Rule 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to move to dismiss

for lack of subject-matter jurisdiction.  A challenge to subject-matter jurisdiction may proceed

either as a facial challenge, asserting that the complaint "fails to allege facts upon which subject

matter jurisdiction can be based," or as a factual challenge, asserting that "the jurisdictional

allegations of the complaint [are] not true."  Kerns v. United States, 585 F.3d 187, 192 (4th Cir.

2009) (quoting Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)).  When a party raises a

facial challenge, the court "accept[s] the facts of the complaint as true as [it] would in the

context of a Rule 12(b)(6) challenge."  Kenny v. Wilson, 885 F.3d 280, 287 (4th Cir. 2018);

Kerns, 585 F.3d at 192.  Conversely, when confronted with a factual challenge, the "court is to

regard the pleadings' allegations as mere evidence on the issue, and may consider evidence

outside the pleadings without converting the proceeding to one for summary judgment."

Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir.

1991).  In addition, "the presumption of truthfulness normally accorded a complaint's

allegations does not apply, and the district court is entitled to decide disputed issues of fact with

respect to subject matter jurisdiction."  Kerns, 585 F.3d at 192.  In either scenario, however, the

party invoking the court's jurisdiction bears the burden of proving by a preponderance of the

evidence that subject-matter jurisdiction is proper.  United States ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347 (4th Cir. 2009).

### B. Yearsley Immunity

"[G]overnment contractors obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States."  Campbell-Ewald Co. v. Gomez, 577 U.S. 153, 166 (2016) (quoting Brady v. Roosevelt S.S. Co., 317 U.S. 575, 583 (1943)).  This concept, known as derivative sovereign immunity, stems from the Supreme Court's decision in Yearsley v. W.A. Ross Construction Co., 309 U.S. 18 (1940).  Cunningham v. Gen. Dynamics Info. Tech., 888 F.3d 640, 649 (4th Cir. 2018) ("[W]e treat the Yearsley doctrine as derivative sovereign immunity that confers jurisdictional immunity from suit.").  In that case, the Court held that a contractor could not be held liable for erosion to the petitioners' land resulting from a construction project that Congress had authorized.  Id. at 19-21.  The Court explained that "that if th[e] authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will."  Id. at 20-21.  "In other words, under *Yearsley*, a government contractor is not subject to suit if (1) the government authorized the contractor's actions and (2) the government 'validly conferred' that authorization, meaning it acted within its constitutional power."  In re KBR, Inc., Burn Pit Litig. (Burn Pit III), 744 F.3d 326, 342 (4th Cir. 2014).  However, "[w]hen a contractor violates both federal law and the Government's explicit instructions, . . . no 'derivative immunity' shields the contractor from suit by persons adversely affected by the violation."  Campbell-Ewald, 577 U.S. at 166.

8

**C. Political Question Doctrine**

It is normally the role of the judiciary "to say what the law is." Marbury v. Madison,

5 U.S. 137, 177 (1803). "Sometimes, however, 'the law is that the [judiciary] has no business

entertaining the claim of unlawfulness – because the question is entrusted to one of the political

branches or involves no judicially enforceable rights.'" Rucho v. Common Cause, 139 S. Ct.

2484, 2494 (2019) (quoting Vieth v. Jubelirer, 541 U.S. 267, 277 (2004)). Such questions are

said to be "nonjusticiable" – or "outside the courts' competence and therefore beyond the courts'

jurisdiction." Id. For example, "most military decisions" are shielded from judicial review,

Taylor v. Kellogg Brown & Root Servs, Inc., 658 F.3d 402, 407 n.9 (4th Cir. 2011), since "the

Constitution delegates authority over military affairs to Congress and to the President as

Commander in Chief" and "contemplates no comparable role for the judiciary," Lebron v.

Rumsfeld, 670 F.3d 540, 548 (4th Cir. 2012). However, "[t]he Constitution's allocation of war

powers to the President and Congress does not exclude the courts from every dispute that can

arguably be connected to 'combat' . . . ." Ibrahim v. Titan Corp., 391 F. Supp. 2d 10, 15

(D.D.C. 2005) (citing Hamdi v. Rumsfeld, 542 U.S. 507 (2004)). Additionally, the fact that a

government contractor "act[ed] under orders of the military does not, in and of itself, insulate

the claim from judicial review." Taylor, 658 F.3d at 411.

In Baker v. Carr, the Supreme Court identified six circumstances in which a case might

present a political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate
> political department; [2] or a lack of judicially discoverable and manageable
> standards for resolving it; [3] or the impossibility of deciding without an initial
> policy determination of a kind clearly for nonjudicial discretion; [4] or the
> impossibility of a court's undertaking independent resolution without expressing

lack of the respect due coordinate branches of government; [5] or an unusual need for unquestioning adherence to a political decision already made; [6] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186, 217 (1962). Relying on <u>Baker</u>, the Fourth Circuit has formulated its own two-factor test to apply in the government contractor context. See <u>Taylor</u>, 658 F.3d at 411. The <u>Taylor</u> test considers:

(1) whether the government contractor was under the "plenary" or "direct" control of the military; and (2) whether national defense interests were "closely intertwined" with military decisions governing the contractor's conduct, such that a decision on the merits of the claim "would require the judiciary to question actual, sensitive judgments made by the military."

<u>Al Shimari v. CACI Premier Tech., Inc.</u> (<u>Al Shimari III</u>), 758 F.3d 516, 533-34 (4th Cir. 2014) (quoting <u>Taylor</u>, 658 F.3d at 411)). "[A]n affirmative answer to either of these questions will signal the presence of a nonjusticiable political question." <u>Id.</u> at 534.

### III. DISCUSSION

Fluor objects to the R&R on four grounds.[2] Fluor argues that the magistrate judge erred by (1) applying the wrong legal standard; (2) "disregard[ing] unrebutted Army testimony confirming the applicable government instructions"; (3) holding that the terms of Modification 13, the Amplification, and DoDI 3020.41 are "competing," thus rendering the <u>Yearsley</u> doctrine

_____

[2] Objections to the R&R must be specific. Failure to file specific objections constitutes a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the district judge. See <u>United States v. Schronce</u>, 727 F.2d 91, 94 & n.4 (4th Cir. 1984). In the absence of specific objections to the R&R, this court is not required to give any explanation for adopting the recommendation. See <u>Camby v. Davis</u>, 718 F.2d 198, 199 (4th Cir. 1983).

inapplicable; and (4) "reject[ing] the political question doctrine."[3]  (Defs.' Objs. 5, 9, 11, 12,

ECF No. 61.)  As discussed below, Fluor's objections are unavailing.

### A. The R&R Applied the Correct Legal Standard.

The R&R correctly noted that Plaintiffs bear the burden of establishing subject-matter

jurisdiction.  (R&R 7, ECF No. 58.)  Fluor argues, however, that the R&R misapplied this

standard and "should have recommended dismissal for lack of subject matter jurisdiction."

(Defs.' Objs. 11-12, ECF No. 61.)  Fluor submits that Plaintiffs presented "no rebuttal

testimony" nor "set forth any specific facts" in response to Fluor's evidence, which "uniformly

established" that Modification 13 and the Amplification were controlling and that Fluor

complied with them.  (Id. 12, ECF No. 61.)  This argument is without merit.

Contrary to Fluor's argument, Plaintiffs "set forth specific facts beyond the pleadings" in

support of their argument that the court has subject-matter jurisdiction.  Richmond,

Fredericksburg & Potomac R.R., 945 F.2d at 768.  Both the EEOC and Hall plainly refer to the

LOGCAP IV Contract, Modification 13, the Amplification, and DoDI 3020.41 throughout their

respective memoranda.  Accordingly, the court rejects Fluor's objection that the R&R

misapplied the proper legal standard to its Rule 12(b)(1) motion.

### B. The R&R Did Not Improperly Discredit Army Testimony.

Fluor next argues that the R&R disregarded "unrebutted testimony" from two senior

Army officials, Col. Raney and Derek M. Schnorrenberg ("Schnorrenberg"), who confirmed that

Fluor complied with the applicable government directives.  (Defs.' Objs. 9-11, ECF No. 61.)

Schnorrenberg served as the Army contracting officer for the task order awarded to Fluor under

---

[3] Fluor's objections have been reordered for ease of discussion.

the LOGCAP IV Contract.  (Defs.' Mot. Dismiss Ex. 2 (Schnorrenberg Decl. ¶¶ 1-2), ECF

No. 42-3).  According to him, Modification 13 and the Amplification were "mandatory contract

requirements."  (Id. Ex. 2 (Schnorrenberg Decl. ¶¶ 8-12), ECF No. 42-3).  Col. Raney served as

Command Surgeon for CENTCOM's Army component during the relevant time period.

(Id. Ex. 1 (Raney Decl. ¶ 2), ECF No. 42-2). As such, he was vested with the authority to issue

medical waivers for Army contract personnel deploying to Afghanistan.  (Id. Ex. 1 (Raney

Decl. ¶¶ 7, 9), ECF No. 42-2).  In Col. Raney's opinion, Fluor's decision not to seek a waiver

was "in accordance with" Modification 13 and the Amplification.  (Id. Ex. 1 (Raney Decl. ¶ 20),

ECF No. 42-2).  Fluor contends that Col. Raney's and Schnorrenberg's declarations "irrefutably

establish[] Fluor's conformance with the applicable government instruction[s]" and that the

magistrate judge erred in concluding otherwise.  (Defs.' Objs. 11, ECF No. 61.)

      Fluor's second objection fails for two reasons.  First, Fluor misconstrues the applicable

standard of review.  In reviewing a Rule 12(b)(1) motion, a court is "free to weigh the evidence

to determine the existence of jurisdiction" because the court's very "power to hear the case is at

issue."  Wake Cnty. Bd. of Educ. v. Dow Roofing Sys., LLC, 792 F. Supp. 2d 897, 900

(E.D.N.C. 2011).  The court, then, is free to choose which evidence to credit and which evidence

to disregard.  See Joshua M. v. Barr, 439 F. Supp. 3d 632, 654 (E.D. Va. 2020) ("[T]he

existence of disputed material facts will not preclude the trial court from evaluating for itself the

merits of jurisdictional claims.")  Second, and more to the point, determining whether Yearsley

immunity applies necessarily requires the court to interpret the LOGCAP IV Contract and "any

laws and regulations that the contract incorporates."  Burn Pit III, 744 F.3d at 345.  These tasks

present questions of law that are solely within the province of the court.  Seabulk Offshore, Ltd.

v. Am. Home Assur. Co., 377 F.3d 408, 418 (4th Cir. 2004) ("The interpretation of a written

contract is a question of law that turns upon a reading of the document itself . . . ."); United

States v. Moriello, 980 F.3d 924, 934 (4th Cir. 2020) ("Regulatory interpretation is a question

of law."); cf. Roe v. Dep't of Defense, 947 F.3d 207 (4th Cir. 2020) (interpreting various

Department of Defense and Air Force instructions as well as Modification 13 in affirming the

district court's injunction barring the discharge of HIV-positive servicemembers).  In other

words, the fact that Col. Raney and Schnorrenberg believe Fluor complied with the applicable

government instructions does not require a finding of Yearsley immunity.  The court therefore

rejects Fluor's second objection.

### C. Yearsley Immunity Does Not Apply.

The magistrate judge framed the Yearsley immunity issue as "whether Fluor followed

the government's instructions in the manner in which it terminated Mr. Hall's employment."

(R&R 9, ECF No. 58.)  The magistrate judge ultimately recommended that Fluor's motion to

dismiss be denied based in part on his conclusion that Modification 13 and the Amplification

(which include a one-year post-remission waiver rule) and DoDI 3020.41 and Enclosure 3

(which do not include such a requirement) are "competing provisions."  (R&R 9,10, ECF No.

58.)  Fluor argues that this was error because, in its view, both sets of provisions apply and "the

specific directives spelled out in [the LOGCAP IV Contract], which mandated compliance with

[Modification 13 and the Amplification], control in the face of DoDI 3020.41's *generalized*

guidance."  (Defs.' Objs. 5-9, ECF No. 61) (emphasis in original).

To begin, the court agrees with Fluor that Modification 13 and the Amplification, on the

one hand, and DoDI 3020.41 and Enclosure 3, on the other hand, are "complementary" rather

than "competing." (Defs.' Objs. 5, ECF No. 61.) DoDI 3020.41 states that its terms apply to all of the Department of Defense's Combatant Commands (one of which is CENTCOM),[4] while specifying in Enclosure 3 that "[t]he geographic [Combatant Commander] will establish theater-specific medical qualifications." (Hall Resp. Opp'n Ex. E (DoDI 3020.41, at 2, 29), ECF No. 53-5.) To this end, Modification 13 and the Amplification established the minimum standards of fitness for deployment to the CENTCOM area of responsibility. (Defs.' Mot. Dismiss Ex. 2 (Schnorrenberg Decl. ¶¶ 6-8), ECF No. 42-3.) Thus, whereas DoDI 3020.41 and Enclosure 3 provided general guidance for all the geographic Combatant Commands, Modification 13 and the Amplification provided additional guidance specific to the CENTCOM area of responsibility. In any event, however, Fluor is not entitled to Yearsley immunity because the military did not authorize Fluor to fire Hall immediately upon learning of his cancer diagnosis. Burn Pit III, 744 F.3d at 342 (characterizing the inquiry under Yearsley's first prong as whether "the government authorized the contractor's actions").

As stated above, the LOGCAP IV Contract required Fluor to comply with Modification 13 and the Amplification's fitness-for-duty standards. These provisions, in turn, required Fluor to comply with DoDI 3020.41 and Enclosure 3. While neither DoDI 3020.41 nor Enclosure 3 contain a remission requirement, the Amplification instructs that "[a]ll cancers should be in complete remission for at least a year before a waiver is submitted." (Defs.' Mot. Dismiss Ex. 3 (Ex. B, at 39), ECF No. 42-4.) It is undisputed that Hall's prostate cancer had not been in remission for a full year in August 2019. Thus, according to Fluor, it is entitled to immunity

---

[4] Combatant Commands, U.S. Dep't of Defense, https://www.defense.gov/About/Combatant-Commands/ (last visited Dec. 2, 2022).

14

because it "simply adhered to the government's instructions" when it "released Hall from the LOGCAP IV project in Afghanistan." (Mem. Supp. Defs.' Mot. Dismiss 21, ECF No. 42-1.) This argument misses the mark.

First, not only did Fluor release Hall from the LOGCAP IV project, but it terminated his employment. Second, even if Hall was barred from deploying under the CENTCOM-specific requirements, nowhere in Modification 13, the Amplification, DoDI 3020.41, or Enclosure 3 did the military authorize Fluor to fire non-deployable contractors upon learning of their disqualifying medical condition. In fact, the LOGCAP IV Contract required Fluor to "comply with . . . all applicable . . . United States . . . national laws" and "United States regulations, directives, instructions, policies, and procedures[.]" (Defs.' Mot. Dismiss Ex. 3 (Ex. C, at 48), ECF No. 42-4.) The LOGCAP IV Contract therefore did not relieve Fluor of its duty under the ADA to engage in the interactive process to identify a reasonable accommodation for a known disability. Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 581 (4th Cir. 2015) ("The ADA imposes upon employers a good-faith duty 'to engage [with their employees] in an interactive process to identify a reasonable accommodation.' This duty is triggered when an employee communicates her disability and desire for an accommodation – even if the employee fails to identify a specific, reasonable accommodation." (internal citation omitted) (quoting Wilson v. Dollar Gen. Corp., 717 F.3d 337, 346 (4th Cir. 2013))). Although Fluor argues that Hall was not a "qualified individual" under the ADA and that engaging in the interactive process would have been futile, those arguments concern the merits of Plaintiffs' claims, not whether Fluor is immune from suit. (Defs.' Reply 10-12, ECF No. 56.)

Consequently, because the government did not authorize Fluor's actions, Fluor is not

15

entitled to derivative sovereign immunity. <u>Campbell-Ewald</u>, 577 U.S. at 166 ("When a contractor violates both federal law and the Government's explicit instructions, as here alleged, no 'derivative immunity' shields the contractor from suit by persons adversely affected by the violation.").[5]

### D. This Case Does Not Implicate the Political Question Doctrine

Finally, Fluor argues that the magistrate judge erred in concluding that the case does not present a nonjusticiable political question under <u>Baker</u> or <u>Taylor</u>. (Defs.' Objs. 12, ECF No. 61.) Fluor specifically argues that adjudicating Plaintiffs' ADA claim will lead to impermissible

---

[5] The court, like the magistrate judge, also questions whether Fluor can claim derivative sovereign immunity when the sovereign itself would not enjoy immunity under the Rehabilitation Act. Although the Fourth Circuit has consistently framed the <u>Yearsley</u> issue as whether the government "authorized" the contractor's actions and the government "validly conferred" that authorization, <u>Cunningham</u>, 888 F.3d at 646; <u>Burn Pit III</u>, 744 F.3d at 342, it seems elementary that "a contractor cannot claim [] <u>derivative</u> immunity that exceeds the immunity of the sovereign," <u>Ruddell v. Triple Canopy, Inc.</u>, No. 1:15-cv-01331, 2016 WL 4529951, *5 (E.D. Va. Aug. 29, 2016) (unpublished) (emphasis in original). Under the Rehabilitation Act, the sovereign is prohibited from discriminating against otherwise qualified federal employees based on disability. 29 U.S.C. § 794(a). It also requires the government to make a "reasonable accommodation" for a known disability of an employee unless doing so would create an "undue hardship." <u>Id.</u> § 794(d); 42 U.S.C. §12112(b)(5)(A). Modification 13 expressly recognizes this and directs that, in the case of a medically disqualified Department of Defense civilian employee, the Department of Defense must make an "individualized assessment" "to determine whether the employee can perform the essential functions of [his or her] position in the deployed environment, with or without reasonable accommodation, without causing undue hardship." (Defs.' Mot. Dismiss Ex. 3 (Ex. B, at 14), ECF No. 42-4.) Thus, had Hall been employed by the Department of Defense, the sovereign would not have enjoyed immunity from suit. If the sovereign is not immune, the argument goes, there is no immunity from which Fluor can derive its own. <u>In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.</u>, 928 F.3d 42, 70 (D.C. Cir. 2019) ("[T]reating KeyPoint employees like OPM employees gets KeyPoint nowhere. It cannot derive an immunity that OPM itself does not have."). Concluding otherwise, as the Eastern District of Virginia recently observed, would "create a regime in which federal contractors acting on government instructions would be the only large employers in the country that could discriminate on the basis of disability with impunity." <u>Ruddell</u>, 2016 WL 4529951, at *6.

"judicial second-guessing of the military's judgments" because it "establishes the [c]ourt – not the military command – as the ultimate arbiter over what [fitness-for-duty] standards should and should not apply." (Id. at 13, ECF No. 61.) Fluor also argues that rejecting the political question doctrine will invite "more intrusive" and "entirely unnecessary" discovery on military officials and that evaluating one of Fluor's defenses – i.e., that Hall's termination was mandated by Modification 13 and the Amplification – will place "front and center" the military's "determination of what conditions should disqualify individuals from being deployed into a theater of war." (Id. at 14-15, ECF No. 61.)

Despite Fluor's assertions, this case does not present a nonjusticiable political question for the simple reason that no military decision, instruction, or judgment is at issue. The undisputed facts reflect that the military was not consulted about Hall's cancer diagnosis or deployability in August 2019 and did not instruct or direct Fluor to terminate Hall's employment. Rather, Fluor alone decided to fire Hall. Therefore, because the crux of this case is whether a private company violated the ADA, the political question doctrine does not mandate dismissal.

Further, this case does not present a nonjusticiable political question under Baker or Taylor. Turning to Baker's first factor, there is no "textually demonstrable constitutional commitment" that the issue raised here – the legality of Hall's termination – be resolved by any branch other than the judiciary. Baker, 369 U.S. at 217.

Second, there certainly are "judicially discoverable and manageable standards for resolving" Plaintiffs' claims, which turn on the application of a federal statute. Id. The Fourth Circuit has emphasized "the long-standing principle that courts are competent to engage in the

traditional judicial exercise of determining whether particular conduct complied with applicable law."  Al Shimari v. CACI Premier Tech., Inc. (Al Shimari IV), 840 F.3d 147, 158 (4th Cir. 2016).  "[T]his principle generally renders justiciable claims against a government contractor alleging a statutory violation" because such claims "require[] a court only to engage in the traditional judicial function of 'say[ing] what the law is,' and of determining how that law applies to the facts of a particular case."  Id. at 158-59 (quoting Burn Pit III, 744 F.3d at 334); El-Shifa Pharm. Indus. Co. v. United States, 607 F.3d 836, 856 (D.C. Cir. 2010) (Kavanaugh, J., concurring in the judgment) ("The Supreme Court has never applied the political question doctrine in a case involving alleged *statutory* violations.  Never." (emphasis in original)).

Third, this case does not require the court to make an "initial policy determination" as the validity of the relevant military policies is not in dispute.  Baker, 369 U.S. at 217.  Though Fluor contends that the R&R mistakenly places the court "as the ultimate arbiter over what [fitness-for-duty] standards should and should not apply," that issue is not before the court. (Defs.' Objs. 13, ECF No. 61.)  Moreover, federal courts surely "retain the authority to interpret and construe provisions issued by the executive branch."  (R&R 14, ECF No. 58.); see Al Shimari IV, 840 F.3d at 159 ("[T]he political question doctrine does not strip courts of their authority to construe treaties and agreements entered into by the executive branch, despite the potential political implications of judicial review.")

Fourth and fifth, adjudicating this case will not demonstrate a lack of respect for the legislative or executive branch – nor does this case present an "unusual need" to adhere to a political decision already made – because the undisputed facts show that no branch was involved in Hall's firing.  Baker, 369 U.S. at 217.

18

Finally, there is no potential for "embarrassment from multifarious pronouncements by various departments on one question" because no other branch will be reviewing whether Fluor violated the ADA.  Id.  Fluor has previously argued that resolving Plaintiffs' claims will require the court to "decide between two views offered by federal Executive Branch entities" (i.e., the EEOC and the military).  (Mem. Supp. Defs.' Mot. Dismiss 26, ECF No. 42-1.)  However, whether the military would have ultimately granted Fluor a CENTCOM waiver for Hall is not the same question as whether Fluor failed to accommodate Hall's purported disability.  In sum, none of the Baker factors are implicated, and the court now turns to the Taylor factors.

The first Taylor factor requires the court to consider whether the military's control over Fluor was both "plenary" and "actual."  In re: KBR, Inc. (Burn Pit V), 893 F.3d 241, 260 (4th Cir. 2018).  Military control is considered plenary if "the military clearly chose *how* to carry out [the contractor's activities], rather than giving the contractor discretion to determine the manner in which the contractual duties would be performed."  Id. (emphasis in original) (quoting Al Shimari III, 758 F.3d at 534).  In addition, the military must have actually exercised this control "in practice," Al Shimari IV, 840 F.3d at 157, and not "merely on[]paper," Burn Pit V, 893 F.3d at 261.

To be sure, the military exercises direct control over access to its bases in the CENTCOM area of responsibility through its fitness-for-duty standards and waiver requirements.  There is no evidence, however, that the military exercised plenary or actual control over Fluor's internal employment practices.  Instead, Fluor retained complete discretion over whom to hire, whom to fire, and whether to accommodate a medically non-deployable contractor.  Cf. Carmichael v. Kellogg, Brown & Root Servs., Inc., 572 F.3d 1271, 1281 (11th

Cir. 2009) (finding direct control in a negligence suit arising from a convoy crash in Iraq when "the military decided the particular date and time for the convoy's departure; the speed at which the convoy was to travel; the decision to travel along a particular route . . . ; how much fuel was to be transported; the number of trucks necessary for the task; the speed at which the vehicles would travel; the distance to be maintained between vehicles; and the security measures that were to be taken"); Burn Pit V, 893 F.3d at 261-62 (finding direct control in case involving KBR's waste management and water services in Iraq and Afghanistan when the military "mandated the use of burn pits"; dictated "where to construct the burn pits, what could or could not be burned, when KBR could operate the burn pits, how high the flames should be, and how large each burn should be"; "interfaced with KBR contractors on a regular basis"; and "continuously and meticulously evaluated whether KBR was meeting the commanders' intent."). Because the military did not have direct control over the alleged acts and omissions that form the basis of Plaintiffs' claims, the first Taylor factor is not implicated.

The second Taylor factor – "whether national defense interests were closely intertwined with the military's decisions governing [Fluor's] conduct" – is not present either because, again, the military never passed judgment on Hall's deployability before his firing. Taylor, 658 F.3d at 411. Likewise, determining whether Fluor violated the ADA will not require the court "to question actual, sensitive judgments made by the military." Al Shimari IV, 840 F.3d at 155 (citation omitted). Plaintiffs are not challenging the validity of the fitness-for-duty requirements or waiver protocols, and as the magistrate judge noted, determining whether Fluor violated the ADA will have "no effect on the military's final authority to set its own fitness for duty

20

standards or its ability to control and regulate personnel qualifications for deployment." (R&R 15, ECF No. 58.)

Consequently, because none of the <u>Baker</u> or <u>Taylor</u> factors are present, the court holds that dismissal is not warranted based on the political question doctrine.

## IV. CONCLUSION

Based on the foregoing, the court finds that Fluor's objections are without merit. Accordingly, the court adopts Magistrate Judge McDonald's R&R, incorporates it herein by reference, and denies Fluor's motion to dismiss.

It is therefore

**ORDERED** that Fluor's motion to dismiss, docket number 42, is denied.

**IT IS SO ORDERED.**

s/Henry M. Herlong, Jr.
Senior United States District Judge

Greenville, South Carolina
December 2, 2022

21